## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BRC ULUSLARARASI TAAHUT
VE TICARET A.S.,                              *

      Plaintiff,                         *

   v.                                     *        Civil Action No. 8:19-cv-00771-PX

LEXON INSURANCE COMPANY, *et al.*,             *

      Defendants.                        *
_____
LEXON INSURANCE COMPANY,                       *

      Cross-Plaintiff,                  *

   v.                                     *

MONTAGE, INC, *et al.*,                        *

      Cross-Defendants.                 *
                          ***

## MEMORANDUM OPINION

Pending before the Court is a motion to confirm the arbitration award and certify the judgment filed by Plaintiff BRC Uluslararasi Taahut ve Ticaret ("BRC") (ECF No. 13); a motion to vacate the arbitration award filed by Montage, Inc. ("Montage") (ECF No. 30); and a motion for preliminary injunction filed by Lexon Insurance Company ("Lexon") (ECF No. 26).  For the following reasons, the Court GRANTS BRC's motion to confirm the arbitration award and certify the judgment (ECF No. 13), DENIES Montage's motion to vacate the award (ECF No. 30), and GRANTS Lexon's preliminary injunction motion (ECF No. 26).

### I.     Background

On September 30, 2016, Defendant Montage, a U.S. based construction company, contracted with the U.S. Department of State's Office of Building Operations ("OBO") to make

security upgrades and interior renovations to the U.S. embassy in Prague, Czech Republic ("the project"). ECF No. 14 at 2; ECF No. 31-2 at 2-3. The contract was valued at $20,282,303.68 and designated Montage as the primary contractor on the project. ECF No. 31-2 at 3. Montage subcontracted with BRC for BRC to perform 100% of the installed contract work, supplying both labor and materials. *Id.* at 2. The subcontract was valued at $11,620,119.43. *Id.* at 3.

Lexon agreed to serve as surety for the project and issued a payment bond to Montage for $15,989,312.68 ("the Bond"). ECF No. 14-2 at 1. As part of that agreement, Montage and three individuals affiliated with Montage—Sina Moayedi, Melissa Gonzales, and Marienela Pugo Quevedo—executed a General Agreement of Indemnity ("Indemnity Agreement") that applied to the Bond. ECF No. 27-1. Under the Indemnity Agreement, Montage and the individual indemnitors promised to deposit collateral as security "immediately upon [Lexon's] demand" if an interested party filed a claim on the Bond. *Id.* at 1. They also agreed to grant unrestricted access to their books and records so that Lexon could assess their financial health and, specifically, their ability to make good on their obligations under the Indemnity Agreement. *Id.* at 3-4.

As for the project, OBO first approved in August 2017 the schedule for completed work in which all parties agreed on a substantial completion deadline of February 5, 2019. ECF No. 31-2 at 3. Shortly after, the project experienced delays associated with site conditions, scheduling problems, design defects, owner-caused delays, and most relevant to this dispute, a breakdown in communications between BRC and Montage. *Id.* at 4; ECF No. 20 at 2. Ultimately, BRC left the worksite in October 2018. ECF No. 31-2 at 6. The project remains unfinished to this day. ECF No. 20 at 2.

Difficulties with the project began after only two months on the job.  ECF No. 31-2 at 3. Montage and BRC communicated to OBO that the February 2019 deadline appeared unworkable, and in response, OBO authorized BRC to perform its work out of order.  *Id.*  BRC remained behind schedule, but OBO nonetheless demanded completion by February 2019.  *Id.*

Aside from contract phasing problems, BRC also encountered differing site conditions, unexpected design issues, and owner-issued changes, all of which exacerbated project delays. *Id.* at 4.  As a result of these delays, Montage submitted 41 Requests for Equitable Adjustments ("REAs") to OBO on behalf of BRC for extra work that, according to BRC, was not included in the subcontract.  ECF No. 14 at 9; ECF No. 14-16.  These REAs totaled $1,288,755, and OBO and Montage have since settled some of them.  *Id.*

With delays and costs accruing, the situation came to a head on October 11 and 12, 2018, when BRC's President, Halis Bozdemir ("Bozdemir") asked Montage's Vice President, Sina Moayedi ("Moayedi") to finance BRC's monthly labor and material costs of approximately $270,000 and deduct those payments from amounts owed.  *Id.*  Moayedi counter offered to finance no more than $50,000.  *Id.*  During the same conversations, according to Moayedi, Bozdemir for the first time conveyed that the project delays would extend the completion date by months, not days.  *Id.* at 6-7.  Bozdemir for his part believed that Montage intended to withhold further payments and pursue arbitration against BRC.  *Id.* at 5.

Shortly after this meeting, Bozdemir notified Montage that BRC was reducing certain management staff.  *Id.* at 4.  Bozdemir also instructed Montage to convert BRC's pending REAs into claims and advised staff not to attend weekly project meetings and to cease electronic communications with Montage.  *Id.* at 4-5.  Moving forward, Bozdemir wanted only his project coordinator Bahadir Unlu ("Unlu") to serve as Montage's point of contact.  *Id.*  Finally, given

3

Montage's representations about withholding payment, Bozdemir instructed Unlu to move BRC's equipment to an off-site warehouse pending its next progress payment. *Id.* at 5-6.

On October 18, 2018, Montage issued a cure notice to BRC per the terms of the subcontract. *Id.* at 5; ECF No. 14 at 2. The notice alerted BRC that it was subject to termination from the project if it failed to bring the project to a "condition which makes timely completion reasonably foreseeable within three (3) calendar days of this notice." ECF No. 31-2 at 5. Yet Montage's project coordinator, Thomas Boiani ("Boiani"), refused to discuss this cure notice with BRC's project manager, Unlu. *Id.* Boiani also stopped BRC from removing its equipment off site and denied BRC site access and access to the project's computer invoicing system. *Id.* Montage, through Boiani and Montage's Safety Manager, also attempted to recruit BRC's supervisory and employees and laborers on site to join Montage in completing the project. *Id.*

BRC responded to the notice to cure, maintaining that it constituted "improper retaliation for the reasonable assurances [BRC requested] that BRC will be paid for work it has performed, and Montage will process BRC's pass-through change orders." *Id.* at 6. BRC further stated that Montage prevented BRC from attempting to cure and had therefore breached the subcontract. As a result, BRC would proceed to demobilize and pursue its legal remedies. *Id.* BRC did so, and Montage terminated BRC for default four days later. *Id.*

Pursuant to the subcontract's terms, BRC invoked the subcontract's arbitration clause against Montage for wrongful termination and default, claiming losses of $6,570,988.[1] ECF No. 14-4. Montage filed a counterclaim in arbitration totaling $7,491,744, which later increased to

---

[1] Section 23.1 titled "Agreement to Arbitration" provides that, "[s]ubject to Section 7.3 entitled 'Claims Relating to Owner,' unless the parties mutually agree otherwise, or the Contract Documents state otherwise, all claims, disputes and matters in question arising out of, or relating to, this Subcontract, of the breach thereof, shall be decided by arbitration, which shall be conducted in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then in effect." ECF No. 31-4 at 17.

$15,820,993.  ECF No. 14-5.   BRC also sought payment for the 41 REAs totaling $1,288,755

that were before OBO for approval at the time BRC had demobilized.  ECF No. 31-2 at 4.

BRC next filed this action on March 13, 2019, claiming Montage breached the

subcontract by wrongfully terminating BRC.  ECF No. 1.  BRC also brought a Miller Act claim

against Montage and Lexon, seeking judgment against the Bond for amounts owed under the

subcontract.  *Id.*  BRC also served on Lexon the Complaint (ECF No. 4) and provided Lexon

separate written notice of its intent to pursue the claims in arbitration, as well as joint and several

liability against Lexon for any amount awarded in BRC's favor.  ECF No. 14-6 at 1.

On April 13, 2019, the parties jointly moved to stay this case pending arbitration, which

this Court granted.  ECF No. 6.  The parties jointly conceded that the matters in arbitration are

"identical" to that raised before this Court, and so a stay would obviate the "necessity to litigate

the same factual issues in multiple venues."  *Id.*

The arbitration was conducted pursuant to the American Arbitration Association

("AAA") rules.  ECF No. 14 at 5.  A three-arbitrator panel presided over a two-week hearing in

Washington, D.C.  *Id.*  On April 3, 2020, the Panel issued its written decision, entitled "Panel

Majority Final Award," in which it determined that BRC had been wrongfully terminated from

the project.  ECF No. 31-2 at 10.  As damages, BRC was awarded $2,362,628.23.  *Id.* at 14.  The

panel also denied Montage's counterclaims entirely.  *Id.* at 12.  Ultimately, the Panel concluded

that Montage's termination was "wrongful as it was effectively taken by 'locking out' BRC's

management from the job site and hiring its employees and workers prior to the expiration of the

three-day cure period."  *Id.* at 10.  The Panel also concluded that because Montage breached the

subcontract, BRC's "demobilization [on October 19 and 20] was excused due to Montage's

interference with BRC's performance."  *Id.*

For damages, the Panel followed the subcontract's "termination for convenience" provision. *Id.* at 9, 11. Specifically, the Panel relied on the outstanding amounts owed on BRC's last invoice submitted before its termination; damages resulting from Montage's failure to register as a Value-Add Tax ("VAT") entity, as contractually required; and attorney's fees and costs, as set out under section 24 of the subcontract. *Id.* at 12-14; ECF No. 31-4 at 18. The Panel also partly offset BRC's recovery based on evidence that OBO (through Montage) had overpaid BRC by $325,345.50 for prior work done in connection with Invoice No. 15, and also that BRC had not completed $293,000 worth of stone unit paver work. ECF No. 31-2 at 13-14. The Panel's final calculation and award of damages to BRC was as follows:

| | |
|---|---|
| Invoice No. 16 | $1,482,295.46 |
| VAT | $542,056.00 |
| Attorney's Fees of Bradley Arant Boult Cummings, LLP, other litigation costs, and expert fees | $956,622.27 |
| Less stone unit pavers | ($293,000.00) |
| Less overpayment for Progress Payment No. 15 | ($325,345.50) |
| Total | $2,362,628.23 |

*Id.* at 14. The Panel also awarded interest calculated in accordance with 28 U.S.C. § 1961(a) from April 3, 2020, the date of the award decision, until paid. *Id.* at 14-15.

The Panel next determined that the final award resolved all claims and counterclaims before it. *Id.* at 15. However, the Panel expressly stated that its decision did not reach the 41 REAs that had been pending before OBO at the time of demobilization. *Id.*; *see also* ECF Nos.

6

14-15 & 14-16.  The Panel denied reaching the REA claims "without prejudice," finding that because the claims were "based on the fault or responsibility of OBO, the owner," the claims were not subject to arbitration pursuant to the subcontract.  ECF No. 14-7 at 11-12.

With arbitration at an end, this Court lifted the stay and the pending motions followed. The Court begins with Montage and BRC's competing motions to confirm and to vacate the arbitration award.  ECF Nos. 13 & 30.

## II.    Motions to Confirm and Vacate the Award

BRC filed its motion to confirm the arbitration award on June 8, 2020, and Montage moved for vacatur of the same shortly after.  ECF Nos. 13 & 30.  Under the Federal Arbitration Act ("FAA"), this Court must grant BRC's motion and confirm the award unless the FAA or one of several limited common law grounds require its reversal or modification.  *See* 9 U.S.C. § 9; *see also MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010); *Williamson Farm v. Diversified Crop Ins. Servs.*, 917 F.3d 247, 253 (4th Cir. 2019).  Montage and BRC's motions, then, are two sides of the same coin, and the Court considers them together. *See id.*; *see also Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, *Inc.*, 142 F.3d 188, 194 (4th Cir. 1998) (holding that district court properly confirmed award because "appellant failed to qualify under any ground … allowing the vacation or modification of an arbitration award"); *Taylor v. Nelson*, 788 F.2d 220, 225 (4th Cir. 1986) (finding confirmation of an arbitration award "is intended to be summary" and "can only be denied if an award has been corrected, vacated, or modified in accordance with the Federal Arbitration Act").

The FAA creates a "strong presumption in favor of confirming arbitration awards," and "judicial review" of such awards "must be an extremely narrow exercise."  *Williamson*, 917 F.3d at 253 (quoting *Long John Silver's Restaurants, Inc. v. Cole*, 514 F.3d 345, 351 (4th Cir. 2008));

*see also MCI Constructors*, 610 F.3d at 857 (quoting *Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC*, 519 F.3d 200, 207 (4th Cir. 2008)); *Apex Plumbing*, 142 F.3d at 193 ("[T]he scope of review of an arbitrator's valuation decision is among the narrowest known at law.").  Under this highly deferential standard, this Court must enforce the award if it finds that the "arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Williamson*, 917 F.3d at 253 (quoting *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 146 (4th Cir. 1994)).  This remains true even when an "award resulted from a misinterpretation of law, faulty legal reasoning or erroneous conclusion." *Id.* (quotations omitted).  Likewise, factual findings underlying an arbitration award are also given "strict deference." *Wells Fargo Advisors, LLC v. Watts*, 540 Fed. Appx. 229, 231-32 (4th Cir. 2013) (citing *Upshur Coals Corp. v. United Mine Workers*, 933 F.2d 225, 229 (4th Cir. 1991)).  To hold otherwise "would frustrate the purpose of arbitration," namely the "quick resolution of disputes and the avoidance of the expense and delay associated with litigation." *MCI Constructors*, 610 F.3d at 857–58 (citing *Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th Cir. 2007)).  Accordingly, Montage, as the party seeking to overturn the award, bears the "heavy burden" of demonstrating the propriety of vacatur.  *Id.* at 857 (citations omitted); *see also Williamson*, 917 F.3d at 253 (quotations omitted).

The FAA provides four narrow grounds for vacatur:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the

8

> controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  Additionally, courts have permitted vacatur where "an award fails to draw its essence from the contract, or the award evidences a manifest disregard of the law."  *MCI Constructors*, 610 F.3d at 857 (quotations omitted).  With this standard in mind, the Court focuses on Montage's arguments.

### A.      The Scope of the Arbitrability Clause in the Subcontract

As an initial matter, Montage contends that the Panel lacked jurisdiction over BRC's claims against Montage for wrongful termination.  ECF No. 44 at 5.  Section 7.4 of the subcontract clearly states that any claims which "neither relate[] to, nor [are] the responsibility" of OBO as the project's "owner" are subject to arbitration.  ECF No. 31-4 at 7.  All other claims "arising out of or relating to problems caused by or which are the responsibility" of OBO are beyond the reach of the arbitration clause and instead are subject to the administrative process set forth in the Contract Disputes Act ("CDA").  *Id.*  Montage now argues that the claims here should have been presented to OBO for resolution pursuant to the CDA because the evidence at the arbitration hearing revealed that OBO was responsible for interfering with BRC, not Montage.  ECF No. 44 at 13–20.  Thus, says Montage, the claims before the Panel arose out of or related to matters in dispute with OBO and are not subject to arbitration.  *Id.*

While "the scope of an arbitration clause defining the arbitrator's jurisdiction is a question for the court," *Local 637, Int'l Bhd. of Elec. Workers  v. Davis H. Elliot Co., Inc.*, 13 F.3d 129, 132 (4th Cir. 1993), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96

F.3d 88, 92 (4th Cir. 1996) (internal quotations and citations omitted); *see also Local 637*, 13 F.3d at 132 ("If it cannot be said with positive assurance that a dispute is excluded from arbitration by a contract's arbitration clause, the doubt should be resolved in favor of an interpretation that submits the dispute to arbitration.") (quotations omitted).

The Panel rightly rejected the very argument that Montage makes here. ECF No. 14-7 at 5. The Panel concluded that the claim before it was simply whether Montage terminated BRC for cause or "convenience" under the subcontract. *Id.* This claim, as framed, did not involve OBO and was thus subject to arbitration. *Id.* That Montage now chooses to defend itself by contending that OBO, in fact, had interfered with BRC's performance, does not change the nature of the claim as asserted by BRC—namely whether Montage had cause under the subcontract's terms to terminate BRC. ECF No. 41 at 14-15.[2] *See AT&T Tech., Inc. v. Comms. Workers of Am.*, 106 S. Ct. 1415, 1420 (1986). This Court finds no grounds to upset the Panel's determination and rejects Montage's jurisdictional argument. *See Local 637*, 13 F.3d at 132.

## B.     The Panel's Award of Invoice No. 16 and VAT[3]

Montage next takes issue with the scope of the Panel's final award. ECF No. 31 at 10. Specifically, Montage challenges that Invoice 16 totaling $1,482,295.46 and a VAT reimbursement $542,056.00 were included in BRC's final award. ECF No. 31-2 at 12. Montage contends that pursuant to the "plain and unambiguous" terms of the subcontract, it was only

---

[2] One arbitrator in dissent disagreed that Montage had "lock[ed] out" BRC. ECF No. 31-3 at 3. But contrary to Montage's arguments, the dissenting arbitrator did not conclude that the Panel lacked jurisdiction to hear the claims. *See id.* at 3-5.

[3] Similar to a sales tax, VAT is common in European countries and is typically imposed on sales of goods by businesses at each stage of production and distribution, as well as on sales of services as they are rendered. *See* American Bar Association, *Value Added Tax: A Model Statute and Commentary* (1989). Under the terms of the primary contract, BRC was entitled to seek VAT reimbursement from OBO (through Montage) for materials purchased in the Czech Republic. ECF No. 31-2 at 12. As reflected in the primary contract, Montage needed to register as a VAT entity with the Czech government for BRC to qualify for a VAT reimbursement. *See id.*

required to pay BRC for its work after Montage had received payment from OBO for the same

work.  ECF No. 31 at 9-11.  Montage cites section 4.3 of the subcontract, referred to as the "pay-

if-paid" clause, which provides:

> [I]t is specifically understood and agreed that payment to the
> Subcontractor is dependent, as a condition precedent, upon Montage
> receiving Contract payments, including retainer, from the Owner.
> Subcontractor expressly waives all right of action against Montage
> until said monies are actually received by Montage from the owner.

ECF No. 31-4 at 4. [4]  Montage argues that the Panel ignored this clause when it awarded BRC

damages on its final Invoice 16 and VAT because no evidence demonstrated that OBO had

approved payment for either.  ECF No. 31 at 8-11.  Thus, in Montage's view, this Court should

vacate the Panel decision as to this aspect of the award because the Panel failed to "draw from

the essence" of the contract and acted in "manifest disregard" of it.  *Id.* at 11-12, 14.

An arbitrator fails to draw from the essence of the contract, or acts in manifest disregard,

if the award is not "rationally inferable from the contract" or contravenes "plain and

unambiguous" contract language.  *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235 (4th

Cir. 2006) (quotations omitted); *see also U.S. Postal Serv. v. Am. Postal Workers Union*, 204

F.3d 523, 527 (4th Cir. 2000) ("When the arbitrator ignores the unambiguous language chosen

by the parties, the arbitrator simply fails to do his job.") (citations omitted).  That said, the Court

is mindful that judicial review of an arbitration award is "among the narrowest known at law."

*Apex Plumbing*, 142 F.3d at 193.  Accordingly, even where this Court may find a panel

misapplied "principles of contractual interpretation" or interpreted a provision in error, the Court

---

[4]*See also* ECF No. 31-4 at 7 (identifying BRC invoices as "pass through" claims, and that BRC is "bound to Montage to the same extent that Montage is bound to Owner by the terms of the Contract Documents and by any and all decisions or determinations made by a Court of the party or board so authorized in the Contract Documents to decide disputes between Montage and Owner whether or not Subcontractor is a party to such proceedings."); *id.* at 3 (providing that BRC is entitled to progress payments approved by both Montage and OBO, and which OBO has paid); *id.* at 17 (excluding from arbitration BRC's claims "relating to" OBO).

is not to disturb the award on that basis alone.  *Patten*, 441 F.3d at 236 (citations omitted); *see also MCI Constructors*, 610 F.3d at 861.  So long as the panel "is even arguably construing or applying the contract and acting within the scope of [its] authority, that a court is convinced [it] committed serious error does not suffice to overturn his decision."  *MCI Constructors*, 610 F.3d at 862 (quotations omitted); *see also Int'l Longshoremen's Ass'n, Local No. 1624 v. Hampton Roads Shipping Ass'n*, 46 F.3d 1124, 1995 WL 19321, at *6 (4th Cir. 1995) ("[A] party may not use §10(a)(4) [of the FAA] merely as a second attempt to obtain review on the merits.") (citations omitted).

Because the Panel grounded its award in the subcontract's terms, this Court will not disturb its decision.  *See MCI Constructors*, 610 F.3d at 862.  The Panel first relied on section 15.4 of the subcontract, which clearly provides that "if Montage wrongfully terminates" BRC, then Montage "shall be liable … for costs [it] would have paid" had it "terminated [BRC] for convenience," and that such remedy "shall be exclusive."  ECF No. 31-2 at 11.  Next, the Court read section 14.1 in conjunction with 15.4.  *Id.*  Section 14.1 governs recovery when the subcontract is "terminated for convenience."  It states:

> If this Subcontract is terminated for convenience, Subcontractor shall comply with all of Montages termination instructions and shall be entitled to receive payment for **work actually performed and a reasonable overhead and profit in connection with such work**. Subcontractor shall be also entitled to any recovery of **profit or unabsorbed overhead** in connection with work not actually performed or future work.

ECF No. 31-4 at 12 (emphasis added).  Based on these provisions, the Panel concluded that BRC was entitled to recover "payment for work actually performed and a reasonable overhead and profit," as opposed to only that work for which Montage had received payment.  ECF No. 31-2 at 11-12.  Accordingly, in the narrow circumstance where the subcontractor is wrongfully

terminated, triggering the "termination for convenience" provision, the subcontractor is entitled to reimbursement consistent with that provision.

This Court finds that the Panel's interpretation of the subcontract was not so manifestly irrational as to warrant vacatur.  *See MCI Constructors*, 610 F.3d at 862.  In fact, the Panel's ruling is consistent with the well-established interpretative canon that the more specific provisions in a contract, like the "termination for convenience" clause, trump general ones, which in this case relate to payment in the ordinary course of performance.  ECF No. 31-2 at 12; *see also* 11 R. Lord, *Williston on Contracts* § 32:10 (4th ed. 2020) ("When general and specific clauses conflict, the specific clause governs the meaning of the contract."); *id.* at § 32.15 (noting that courts will often "give preference to … the more important or dominant of two conflicting clauses, or the more specific of two clauses that conflict with one another.").  The Court simply has no basis to conclude that the Panel was plainly or unambiguously required to have ruled otherwise.[5]  *See Upshur Coals Corp.*, 933 F.2d at 229 ("As long as the arbitrator is even arguably construing or applying the contract a court may not vacate the arbitrator's judgment.") (citations omitted); *MCI Constructors*, 610 F.3d at 862 (same) (citations omitted).

As to whether the challenged payments reflect amounts owed to BRC, the Court defers to the Panel's factual findings.  *See Wells Fargo*, 540 Fed. Appx. at 231–32 (citing *Upshur Coals Corp.*, 933 F.2d at 229).  The Panel reasonably considered Invoice Number 16 as a fair and accurate valuation of BRC's work performed and outstanding amounts owed.  ECF No. 31-2 at 12; ECF No. 39 at 12.  Montage, in fact, submitted this invoice to OBO for approval without

---

[5] The Court notes that the Panel's determination aligns with a growing skepticism as to the validity of such pay-if-paid (or pay-when-paid) clauses to the extent they extinguish a subcontractor's right to collect payment per the terms of the Miller Act.  *See United States ex rel. Tusco, Inc., v. Clark Constr. Grp.*, 235 F. Supp. 3d 745, 756-57 (D. Md. 2016) (collecting cases*); United States v. Continental Cas. Co.*, No. ELH-16-3047, 2017 WL 3642957, at *13 (D. Md. Aug. 24, 2017).

revision, thereby endorsing it.  *See* ECF No. 39-1 at 3; ECF No. 39-2 at 2.  Thus, the Panel's

determination rested on record evidence, which this Court cannot and will not disturb.

Montage, again, challenges the award based on the subcontract's pay-if-paid clause.  ECF

No. 31 at 8-11.  The Court stands by its decision that this clause does not upset the Panel's

reasoning as to how payment is determined in the event Montage wrongfully terminated the

subcontract.  However, even if the clause somehow comes into play, no evidence before the

Panel demonstrated that OBO had only approved part of Invoice 16.  *Compare* ECF No. 39 at

15–16 *with* ECF No. 44 at 17–18.  The Panel specifically noted that "Montage did not set forth

the items and amounts in change orders issued post-termination providing compensation to

Montage for work performed by BRC in part prior to termination."  ECF No. 31-9 at 3.  Because

OBO would have made such payments to Montage after BRC had ended the subcontract, it was

not unreasonable for the Panel to look to Montage to present evidence reflecting any such partial

rejection of Invoice 16.  This Montage did not do.  Montage now wishes to litigate what it failed

to before the Panel, which far exceeds the "narrow review" of this Court.  *See Int'l*

*Longshoremen's Ass'n v. Steamship Trade Ass'n of Balt., Inc.*, No. MJG-95-1712, 1996 WL

172178, at *6 (D. Md. Feb. 28, 1996) (finding a movant "cannot attempt to overturn an

Arbitrator's decision solely because the Arbitrator did not accept its version of the facts");

*Amerada Hess Corp. v. S/S ATHENA*, No. M-82-3553, 1986 WL 1165741, at *7 (D. Md. Jan. 16,

1986) ("[T]o the extent that Owners' arguments rely on new evidence, the Act does not allow

vacation of an award on this ground.") (citations omitted).  The Court, therefore, declines to

vacate the Panel award pertaining to Invoice 16.

Similarly, as to the VAT, the Panel found that the award was warranted because Montage

failed to register for VAT as it was required to do under the primary contract between it and

OBO.  ECF No. 31-2 at 12.  Montage again attempts to shift blame to OBO, contending that the

Panel did not have evidence that OBO ever approved the VAT tax and that the pay-if-paid clause

would "exclude" such payment as a result.  ECF No. 31 at 5, 11.  The Court's determination

regarding the interplay of the subcontracts provision applies with equal force here.  *See Patten,*

441 F.3d at 235; *MCI Constructors*, 610 F.3d at 862. The Panel's conclusion that the

"termination for convenience" provision applies will not be overturned as to the VAT

reimbursement.

Montage alternatively contends that the Panel erred by awarding VAT when the

subcontract "expressly excludes" it from payment.  ECF No. 31 at 11; ECF No. 44 at 20.  Again,

Montage's arguments do not upset the Panel's determination.  Section 2 of the subcontract

provides that BRC would be paid for "the satisfactory performance of Subcontractor's work,

subject to additions and deductions by change order of other Subcontract provisions, the total

sum of Twelve Million U.S. Dollars ($12,000,000) excluding VAT **(if applicable)** in accordance

with section 4."  ECF No. 31-4 at 3 (emphasis added).  Additionally, the primary contract

provided for VAT reimbursement and required Montage to register for VAT.  ECF No. 31-2 at

12.  Montage failed to do so despite BRC's repeated reminders.  *Id.*  Montage has provided no

reason for the Court to conclude that the Panel's decision was irrational or contrary to the plain

terms of the operative contracts.  Thus, the award as to VAT will not be vacated.

### C.    Panel's Award of Attorney's Fees

Lastly, Montage asserts the Panel "redraft[ed]" section 24 by awarding attorney's fees

only to BRC.  ECF No. 31 at 13.  The Court is unpersuaded.

Section 24 plainly states:

> Should either party employ an attorney to institute suit or demand
> arbitration to enforce any of the provisions hereof, to protect its

> interest in any matter arising under this Subcontract, or to collect damages for the breach of this Subcontract, or to recover on a surety bond given by a party under this Subcontract **the prevailing party** shall be entitled to recover reasonable attorney's fees, costs, charges, and expenses expended or incurred therein.

ECF No. 31-4 at 18 (emphasis added).

Despite the Panel having found in favor of BRC, Montage now claims that BRC is not entitled to attorney's fees.  ECF No. 31 at 13.  BRC "lost," says Montage, because the Panel had not adopted certain of BRC's recovery theories and BRC was not awarded every penny of that which it sought.  *Id.*  Accordingly, presses Montage, the Panel "manifestly disregard[ed] the law in finding BRC 'prevailed' on its claims."  *Id.* at 14.

This argument carries no weight.  Section 2.4 plainly, unambiguously and without qualification provides for the loser to pay the winner's attorney's fees.  ECF No. 31-4 at 18; *see also Patten,* 441 F.3d at 235.  The Panel found that BRC was the prevailing party, and this Court has been given no sound reason to conclude otherwise.  ECF No. 31-2 at 13 (BRC "prevailed on the issue that drove the hearing and all briefing: whether the default termination should stand").[6] Specifically, the Court rejects Montage's attempt to recharacterize the Panel's offset of the final award by the amount already paid to BRC as a victory under Montage's counterclaims.  The Panel's careful avoidance of awarding double recovery to BRC does not transform Montage into a prevailing party.

In sum, because Montage has provided no grounds to support vacatur of the Panel award, this Court must confirm the same.  *See* 9 U.S.C. § 9; *see also MCI Constructors,* 610 F.3d at 857;

---

[6] Montage attempts to make hay with the Panel's offsetting BRC's award by $618,345 based on Montage's counterclaims.  ECF No. 31 at 13-14.  This offset does not transform Montage into a "prevailing party" per the Panel's ultimate determination.  As to liability, the Panel granted BRC's claims and denied Montage's counterclaims but then simply offset the final award by the amount Montage had already paid BRC for work performed.  ECF No. 31-2 at 12-13.

16

*Williamson*, 917 F.3d at 253; *Taylor*, 788 F.2d at 225. Montage's motion to vacate the award is therefore denied and BRC's motion to confirm granted.

The Court next turns to BRC's motion to enforce the award as to Lexon.

### III.    Motion to Enforce

BRC requests that this Court declare Lexon as bound by the arbitration award. ECF No. 14 at 14. Although Lexon was not a party to the arbitration, it is the surety on the project. ECF No. 27 at 2. Lexon was also on notice of BRC's demand for arbitration in March of last year and received specific warning that should BRC prevail, it would seek to enforce the arbitration award against Lexon. ECF No. 14-6 at 1. Lexon also consented to stay this proceeding pending the outcome of arbitration. ECF No. 6.

Such notice is sufficient to bind Lexon to the arbitration award. This Court adopts the reasoning set forth in *U.S. ex rel. MPA Constr., Inc v. XL Specialty Ins. Co.*, 349 F. Supp. 2d 934, 942 (D. Md. 2004). There, the court explained that although a surety may not be subject to "the subcontract's arbitration clause," and thus cannot be "required to arbitrate," the surety may still be subject to the results of the arbitration between contractors. *Id.* This is because "'a judgment against a principal conclusively establishes the liability of a surety, as long as the surety had notice of the proceedings against the principal.'" *Id.* (quoting *United States ex rel. Skip Kirchdorfer, Inc. v. M.J. Kelley Corp.*, 995 F.2d 656, 661 (6th Cir. 1993) (citing *Frederick v. United States*, 386 F.2d 481, 485 n.6 (5th Cir. 1967)) (citing *United States ex rel. Aurora Painting, Inc. v. Fireman's Fund Ins. Co*., 832 F.2d 1150, 1151 (9th Cir. 1987) (surety is bound by arbitration decision even though it "was not a named party in … the arbitration and made no appearances.")); *see also Drill South, Inc. v. Int'l Fid. Ins. Co.*, 234 F.3d 1232, 1235 (11th Cir. 2000) ("[T]he general rule that has emerged is that a surety is bound by any judgment against its

17

principal … when the surety had full knowledge of the action against the principal and an opportunity to defend it.") (citations omitted).

Before pursuing arbitration, BRC joined Lexon to this action. ECF No. 1; *see XL Specialty Ins. Co.*, 349 F. Supp. 2d at 942 (finding notice where the surety was named as a defendant in the "district court complaint filed immediately prior to the arbitration"). And as surety, Lexon steps into the shoes of Montage in satisfying payment obligations to the subcontractor, BRC. ECF No. 14-2. Lexon even consented to this Court's issuance of a stay pending the outcome of arbitration. ECF Nos. 6 & 14-6.

Lexon clearly knew that the arbitration would occur. Now dissatisfied with the outcome, Lexon wishes not to be bound by the very proceeding that Lexon averred would avoid duplicative litigation. ECF No. 6 at 3-4. The Court suspects that had Montage prevailed in arbitration, Lexon would be singing a different tune. Lexon will not be afforded a second bite at the litigation apple simply because it must now honor its obligations as the surety on the project.

More fundamentally, basic principles of *res judicata* support enforcing the judgment against Lexon. Where, as here, the interests of the non-party in arbitration align squarely with that of the party in arbitration, and as to the facts and issues fully litigated in arbitration, the Court can discern no rational basis to permit litigation anew. To find otherwise would upset the primary reasons for favoring arbitration in the first instance—efficient and final resolution of disputes outside the court system. *See, e.g.*, *U.S. ex rel. Frank M. Sheesley Co. v. St. Paul Fire & Marine Ins. Co.,* 239 F.R.D. 404, 418–19 (W.D. Pa. 2006) (citing *Isidor Paiewonsky Assocs., Inc. v. Sharp Properties, Inc.*, 998 F.2d 145, 155 (3d Cir.1993); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1122 (3d Cir. 1993) (citing *Isido*r for the proposition that "arbitration agreements may be upheld against non-parties where the interests of such parties are

directly related to, if not congruent with, those of a signatory")).  The Court thus declares that the arbitration award is enforceable against Lexon.[7]

## IV.    BRC's Rule 54(b) Motion

BRC next asks this Court to enter final judgment in its favor against Montage and Lexon pursuant to Rule 54(b) as to some, but not all, of the claims in this action.  ECF No. 14 at 16. The Court agrees with BRC and will grant the relief here.

 The Panel resolved all claims between BRC and Montage, except for BRC's REA claims.  ECF No. 31-2 at 15.  Lexon has also filed cross claims against Montage, Moayedi, and Gonzales which are not squarely resolved by enforcement of the arbitration award.  *See id.* BRC's current motion recognizes as much, as it seeks certification only of the arbitration award for $2,362,628.23 as a final judgment.  ECF No. 14 at 16.  Montage urges delay.[8]

In deciding a motion brought pursuant to Rule 54(b), the Court must consider first whether the judgment is in fact final; and second, whether "there is no just reason for delay." *MCI Constructors*, 610 F.3d at 855 (quoting Fed. R. Civ. P. 54(b)).  A judgment is final if it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action." *Id.* (quotations omitted).  As to the second prong, whether "no just reason" exists for delay, the Fourth Circuit directs this Court to consider several factors:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the

---

[7] As discussed at the virtual motions hearing conducted on November 18, 2020, the full damages award is enforceable against Lexon, including attorney's fees and VAT.  *See U.S. ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.*, 86 F.3d 332, 336 (4th Cir. 1996) (per curiam) (holding that "attorney's fees and interest may be sums justly due under the Miller Act").  Further, having not presented any briefing on the bond's scope of coverage as to the damages awarded, Lexon accordingly waived any challenge regarding its obligation to pay the full damages award under the terms and conditions of the bond issued.  ECF No. 56.

[8] Lexon did not oppose BRC's Rule 54(b) motion (ECF No. 13) and has waived any objection to the award's enforceability (ECF No. 56).

> same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in a set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Id.* (quotations omitted). Rule 54(b) certification is the "exception rather than the norm," and so the "burden is on the party endeavoring to obtain Rule 54(b) certification to demonstrate that the case warrants certification." *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1335 (4th Cir. 1993) (quotations omitted) (denying 54(b) motion where there is a possibility of double recovery).

BRC has satisfied its burden. The Panel decision makes clear that it resolved all claims between BRC and Montage, except for BRC's REA claims. ECF No. 31-2 at 15 (confirming its award "resolve[s] all claims and counterclaims … submitted to this arbitration"). As to the claims resolved, there is nothing further for this Court to consider or decide before it may direct an entry of final judgment. *See Norfolk S. Ry. Co. v. Sprint Comms. Co. LP*, 883 F.3d 417, 422–23 (4th Cir. 2018) (citing *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc*., 157 F.3d 174, 177 (2d. Cir. 1998) (concluding an arbitration award is "final" if it "resolve[s] all issues submitted to arbitration"); *Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC*, 319 F.3d 1060, 1069 (8th Cir. 2003) (suggesting an award is not "final" if conditioned on the outcome of future court proceedings); *Remmey v. PaineWebber, Inc*., 32 F.3d 143, 150 (4th Cir. 1994) (award stating that all claims made by claimant "shall be and are hereby dismissed in all respects" was "final" and "definite" under the FAA)). Thus, the arbitration award is clear, circumscribed, and final.

Additionally, the Court cannot find any just reason for delay. Fed. R. Civ. P. 54(b). To be sure, the resolved and unresolved claims arise from the same universe of facts. But this Court

can easily determine which claims remain open for this Court's resolution.  ECF No. 31-2 at 15.

Indeed, the parties jointly acknowledged as much when they urged the Court to stay the

proceedings pending arbitration so as to *avoid duplicative litigation*.  ECF No. 6 at 3-4.  If

Montage had thought at the time such an award would risk invading the province of the non-

arbitrable claims, then it ought not have agreed to a stay whose justification was precisely the

opposite.

In this respect, the Court easily concludes that the arbitration award does not visit any

"binding or preclusive effect" on the remaining issues for resolution.  *MCI Constructors*, 610

F.3d at 856.  The REA claims concern a distinct legal inquiry not raised in arbitration—whether

BRC's change order requests and REAs that OBO had ordered exceed the scope of BRC's

contract, thus triggering BRC's right to additional payment.  Similarly, Lexon's cross claims

derive solely from the Indemnity Agreement and therefore also raise distinct factual and legal

issues.  Because the remaining matters are wholly separate from those arbitrated, any appeal of

the arbitration award will not moot the remaining claims.  *See id.*

The Panel also reviewed and denied Montage's counterclaims against BRC.  ECF No.

31-2 at 12.  Consequently, whether BRC succeeds on the remaining claims before this Court, any

possibility of Montage seeking set-off against the arbitration award has been extinguished.[9]  *See*

*Braswell Shipyards*, 2 F.3d at 1339 (declining 54(b) motion where possibility of double

recovery).  Finally, as to any miscellaneous concerns, this Court considers the Miller Act's

---

[9] Montage briefly raises that items billed in Invoice 16 and recovered by BRC in the arbitration award are also "billed in duplicate in its pass-through REAs."  ECF No. 20 at 16-17.  But no such "duplicate" items appear in Invoice 16, and even if they had, such duplicates would only require a set-off of the potential amounts owed on the REA claims, not on the arbitration award.  *See MCI Constructors*, 610 F.3d at 855 (framing the inquiry as whether "the presence or absence of a claim or counterclaim … could result in a set-off *against the judgment sought to be made final*") (emphasis added).  Nor does this case present the "double recovery" concern that was at issue in *Braswell Shipyards*, 2 F.3d at 1339, where the award amount for the state law claim, which the court entered final judgment on first, would likely decrease once the court reached the merits of the federal claim. By contrast, BRC's remaining claims have no impact on the total recovery amount in the arbitration award.

purpose in protecting those who "supply[] labor and materials … on federal construction projects," such as BRC. *U.S. for Use of Honeywell, Inc. v. A & L Mech. Contractors, Inc.*, 677 F.2d 383, 386 (4th Cir. 1982); *see also Clark Constr. Group,* 235 F. Supp. 3d at 756 (noting the "essence of its policy is to provide a surety who, by force of the [Miller] Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material.") (quotations omitted). Enforcement of the arbitration award as a final judgment is consistent with the goals of the Miller Act.

In the end, BRC's request to enter final judgment as to the arbitration award is proper and well supported. The Court grants BRC's 54(b) motion and will enter final judgment in favor of BRC against Montage and Lexon for all claims covered by the arbitration award and in the amount of $2,362,628.23 plus interest in accordance with 28 U.S.C. § 1961(a). ECF No. 31-2 at 14. BRC may file a separate motion for attorney's fees and costs for seeking confirmation of the award, consistent with Rule 54(d)(2) and Local Rule 109.2.

## V.     Lexon's Preliminary Injunction Motion

Lastly, Because the Court has concluded the arbitration award is final and enforceable against Lexon, it must next resolve Lexon's motion for injunctive relief against Montage and individual indemnitors Sina Moayedi and Melissa Gonzales (collectively the "Indemnitors") pursuant to the Indemnity Agreement. ECF No. 26. Lexon contends the Indemnitors have breached the Indemnity Agreement by failing to post collateral as security on the Bond in the amount of $2,362,628.23, and by refusing to allow Lexon to inspect their books and records. ECF No. 27 at 2. Lexon therefore asks this Court to compel specific performance of the Indemnity Agreement's terms. *Id.* at 9. For the following reasons, the Court grants Lexon's motion.

22

The terms of the Indemnity Agreement are plain and not in dispute. The Indemnitors indemnified Lexon against all losses incurred as a result of Lexon having issued the Bond. ECF No. 27-1 at 1. The Indemnitors further agreed to deposit collateral security "immediately upon demand" equal to liabilities either "established" or "asserted" against Lexon on account of the bonds issued. *Id.* at 1-2. They also agreed to provide Lexon with "unrestricted access" to their books and records at any time until all bonds issued by Lexon had been terminated. *Id.* at 3.

Shortly after the Panel found Montage liable, thus triggering Lexon's obligations under the Bond, Lexon demanded in writing of the Indemnitors cash collateral for the full award amount of $2,362,628.23, as well as access to their books and records. ECF No. 27-3 at 5. Seven months have passed, and the Indemnitors have yet to post any collateral. ECF No. 27-2 at 3. As for Lexon's demand for access to financial records, Lexon initially maintained that Montage has "failed to provide Lexon access to [their] books and records as demanded in Lexon's April 17, 2020 demand letter." *Id.* Since then, Montage has provided a "limited production," which, in Lexon's view, falls far short of compliance. ECF No. 45 at 2. Montage maintains it has complied with this requirement. ECF No. 40 at 2.

A preliminary injunction is "an extraordinary remedy" and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail, Lexon must establish (1) its likelihood of success on the merits; (2) that it will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20 (citations omitted); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) (citations omitted). Lexon must satisfy each requirement as articulated. *See Real Truth About*

*Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).  The Court considers each factor in turn.

A.      **Likelihood of Success on the Merits**

As a threshold matter, the Court must determine which state law applies.  To do so, the Court looks to the choice-of-law principles of the forum state, Maryland.  *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Branhaven, LLC v. BeefTek, Inc.*, 965 F. Supp. 2d 650, 664 (D. Md. 2013) (citation omitted).  Under Maryland law, if a contract does not include a choice-of-law provision, the Court applies the principle of *lex loci contractus*, employing the law of the jurisdiction where the contract was formed.  *See, e.g.*, *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529 (1992).  The Indemnity Agreement does not include a choice-of-law provision, but it appears that the parties all executed the Indemnity Agreement in Washington, D.C.  ECF No. 27-1 at 5, 9.  Accordingly, D.C. law governs.

Under D.C. law, the elements for a breach of contract claim are (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach.  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009); *see also Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015).  Written indemnity agreements are treated as any other contract and so are subject to the same general principles of contract interpretation.  *See Am. Bldg. Maint. Co. v. L'Enfant Plaza Props., Inc.*, 655 A.2d 858, 861 (D.C. 1995); *W.M. Schlosser Co., Inc. v. Maryland Drywall Co.*, *Inc.*, 673 A.2d 647, 653 (D.C. 1996) (finding that where a party intends for a contract provision to "shift responsibility," the provision must "clearly reflect[] such a purpose") (citations omitted); *Parker v. John Moriarty & Assocs.*, 189 F. Supp. 3d 38, 43 (D.D.C. 2016) (explaining that for indemnity agreements, the "mutual intention of the parties to this effect should appear with clarity from the

24

face of the contract.") (citations omitted).  Where the terms of the agreement are clear and

unambiguous, a surety may seek to enforce such terms accordingly.  *See Parker*, 189 F. Supp. 3d

at 43; *Greenwich Ins. Co. v. ICE Contractors, Inc.*, 541 F. Supp. 2d 327, 330 (D.D.C. 2008);

*Argonaut Ins. Co. v. Lynchburg Steel & Specialty Co.*, 308 F. Supp. 3d 218, 220 (D.D.C. 2018).

      The record reflects that Lexon is likely to succeed in showing that the Indemnitors

breached the Indemnity Agreement.  It is undisputed that Lexon issued the Bond in connection

with the project.  ECF No. 27-2 at 17–19.  The Agreement obligates Lexon to act as a surety on

Montage's behalf which requires Lexon to ensure payment to subcontractors such as BRC for

labor and materials.  *Id.*; ECF No. 40 at 2.  The Indemnitors, in exchange, agreed to "indemnify,

exonerate and save [Lexon] harmless from and against any and all liability, loss, and expense of

whatsoever kind and nature, including, but not limited to, every claim, demand, liability, court

costs, damages, attorney's fees, … which the Surety may pay or incur by reason of having

executed, or procured the execution of, any Bond or Bonds."  ECF No. 27-1 at 1.  Likewise, the

Indemnitors also agreed to post collateral "immediately upon demand," equal to Lexon's liability

"if established" or the "liability *asserted* against [Lexon], or for "any other reason whatsoever …

to cover any and all liability …. or *possible liability* … for which Indemnitors *may be obligated*

to Indemnify the Surety under the terms of this Agreement."  *Id.* (emphasis added).  The

Indemnity Agreement further stated that Lexon "[a]t any time, and until such time as the liability

of [Lexon] under any and all Bonds is terminated … shall have unrestricted access to any and all

books, records, trust funds, accounts, documents, or any other information pertaining to the

financial affairs or operations of the Indemnitors."  *Id.* at 3.

      With BRC having secured an arbitration award against Montage—and by extension

against Lexon as surety—Lexon's written demand "fits squarely within the range of situations

that the Indemnity Agreement, in particular its collateral security provision, was designed to cover." *Travelers Cas. & Surety Co. of Am. v. C.R. Calderon Constr., Inc.*, No. TDC-17-0282, 2017 WL 2256600, at *5 (D. Md. May 22, 2017).  Thus, under the plain and unambiguous terms of the Indemnity Agreement, when Lexon demanded that the Indemnitors post $2,363,628.23 in collateral security, the Indemnitors were contractually obligated to comply.  *See* ECF No. 27-1 at 1.  None have posted the security, and this failure amounts to a clear breach of the Indemnity Agreement.  Lexon is therefore likely to succeed on its breach of contract claim.

## B.    Irreparable Harm

The Court next considers whether Lexon has demonstrated that it is likely to suffer irreparable harm absent an injunction.  Importantly, Lexon must show a likelihood of irreparable harm, not just the mere possibility that harm may result were injunctive relief denied.  *See United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013) (citations omitted).  The harm in question must be "neither remote nor speculative, but actual and imminent."  *Direx Israel, Ltd. v. Breakthrough Med. Corp*., 952 F.2d 802, 812 (4th Cir. 1991) (quotations omitted).

Montage and individual indemnitors Moayedi and Gonzales vigorously contend that Lexon is unable to make this showing because any such harm may be compensated through money damages.[10]  ECF No. 40 at 5; ECF No. 53 at 2.  But the nature of the injury is not simply monetary.  The harm amounts instead to the failure of Montage to perfect Lexon's security interest.  This security interest would otherwise be lost absent specific performance, which is achieved by granting the requested injunctive relief.  *See Travelers*, 2017 WL 2256600, at *4. "'Sureties are ordinarily entitled to specific performance of collateral security clauses,' because without such specific performance, the surety will lose 'the security position for which [it]

---

[10] In its opposition, Montage also makes the now moot argument that preliminary injunctive relief is inappropriate because the arbitration award has not yet been confirmed. ECF No. 40 at 4.

bargained.'" *Id.* (quoting *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984)).

Accordingly, the provision requiring the posting of collateral would "be rendered a nullity, a

result that runs contrary to basic precepts of contract construction." *Id.* (quotation omitted).  In

this critical respect, "a surety's loss of its right to collateralization cannot be adequately remedied

through money damages." *Id.* (quotation omitted) (collecting cases).

Lexon, as surety, sought this very kind of security position in requiring Indemnitors to

post collateral.  *See id.*  Absent injunctive relief, Lexon must now bear the brunt of satisfying the

award in BRC's favor without the very collateral it had secured.  Montage for its part essentially

concedes it has little incentive to post the collateral, given its admitted financial difficulties

renders such posting an impediment to completing several other ongoing projects.  ECF No. 40

at 2.  Granting the requested injunctive relief would avoid the harm that Lexon must shoulder the

burden of satisfying the arbitration award without the very collateral it had bargained to secure

from Montage.  *See Travelers*, 2017 WL 2256600, at *4.

The matter of irreparable harm is even stronger as to the individual indemnitors.

Moayedi—while participating in this litigation in his official capacity as Montage's Vice

President—has until recently actively evaded service of process.  ECF No. 40-1; ECF No. 45-1;

ECF No. 45-2.  Before this Court granted the motion for alternative service (ECF No. 47), he and

Gonzales directed Montage's counsel *not* to accept service for them.  ECF No. 45-3.  Such

conduct underscores that neither indemnitor has much interest in honoring their obligations

pursuant to the Indemnity Agreement.  The evident risk of non-payment by the Indemnitors is

the "very risk that the collateral security provision of the Indemnity Agreement was meant to

obviate." *Travelers*, 2017 WL 2256600, at *4.  Because money damages cannot capture the

harm arising from Lexon "unduly bearing this risk of non-payment and the loss of its bargained-

for security position as compared to other creditors," injunctive relief is proper. *Id.* (quotation omitted).

###    C.    Balance of Equities and Public Interest

For similar reasons, the balance of equities tips in Lexon's favor. Absent an injunction, Lexon will lose the benefit of its bargain—obtaining a security priority. By contrast, Montage and the individual indemnitors face no "comparable, cognizable injury because 'requiring a party to comply with its contractual obligations does not constitute harm.'" *Id.* at *5 (quoting *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 593 (E.D. Va. 2008)). Clearly, the equities favor granting the requested relief.

As to the public interest, this Court recognizes that enforcement of contracts remains of critical importance against those who seek to "escape from their obligations." *Id.* (quoting *Smith Braedon Co. v. Hadid*, 825 F.2d 787, 790–91 (4th Cir. 1987)); *see also Ledo Pizza System, Inc. v. Singh*, 983 F. Supp. 2d 632, 643 (D. Md. 2013); *NaturaLawn of Am., Inc. v. West Group, LLC*, 484 F. Supp. 2d 392, 404 (D. Md. 2007). This is particularly so where the relief involves preservation of the "vital role" that sureties play in the construction industry in "providing 'financial strength and credit' to ensure that a contractor has the 'ability to perform its obligations.'" *Travelers*, 2017 WL 2256600, at *5 (quoting *Liberty Mut. Ins. Co. v. Aventura Eng'g & Const.*, 534 F. Supp. 2d 1290, 1303 (S.D. Fla. 2008)); *see also First Nat. Ins. Co. of Am. v. Sappah Bros. Inc.*, 771 F. Supp. 2d 569, 576 (E.D.N.C. 2011) ("[E]nforcing the collateral security provision of an indemnity agreement in the construction setting … encourage[s] sureties to continue to provide bonds for public construction contracts."). Because the remaining *Winter* factors favor the issuance of a preliminary injunction, this Court will therefore grant the motion and enter a preliminary injunction ordering Montage, Moayedi, and Gonzales to jointly and

severally post collateral security in the amount of $2,362,628.23; and to grant Lexon access to their books and records.[11]

## VI.      Conclusion

For the foregoing reasons, BRC's motion to confirm the arbitration award and enter final judgment against Montage and Lexon is GRANTED (ECF No. 13), Montage's motion to vacate the same is DENIED (ECF No. 30), and Lexon's motion for preliminary injunction is GRANTED (ECF No. 26).  A separate Order follows.

November 19, 2020_____                    _____/s/_____
Date                                                                  Paula Xinis
                                                                      United States District Judge

---

[11] Although the Court grants injunctive relief to ensure that the Indemnitors honor the Indemnity Agreement, it recognizes that posting the collateral as cash may challenge the Indemnitors' financial solvency. Accordingly, and in the alternative, the Indemnitors may post collateral in the form of real property or other assets equal to the amount of the arbitration award.